# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

RUBEN HUERTA,                            )
     Plaintiff,                          )
                              )
                              )   CAUSE NO.: 2:09-CV-001-PRC
                              )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security          )
Administration,                          )
     Defendant.                          )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Ruben Huerta on January 2, 2009, and a Social Security Opening Brief [DE 18], filed by Plaintiff on May 12, 2009. Plaintiff requests that the June 25, 2007 decision of the Administrative Law Judge to deny him disability insurance and supplemental security income benefits be reversed or, alternatively, remanded for further proceedings. For the following reasons, the Court denies Plaintiff's request and reaffirms the decision of the Administrative Law Judge.

## PROCEDURAL BACKGROUND

On September 20, 2004, Plaintiff applied for disability insurance ("DIB") and supplemental security income ("SSI") benefits, alleging that he became disabled as of December 24, 2003. Plaintiff's application was initially denied on February 1, 2005, and again upon reconsideration on April 20, 2005. On May 10, 2005, Plaintiff filed a timely request for an administrative hearing, and, on July 10, 2006, Plaintiff appeared with counsel and testified at a hearing before an Administrative Law Judge ("ALJ"). A medical expert and a vocational expert also appeared and testified. A supplemental hearing was held on March 14, 2007, at which time evidence from psychological and orthopedic consultative examinations were entered into the record. Plaintiff, Plaintiff's sister, and

the same vocational expert appeared and testified. In a decision dated June 25, 2007, the ALJ denied

Plaintiff's claim for DIB and SSI benefits and made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since December 24, 2003, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: disorders of the back; obesity; and hypertension (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift/carry 50 pounds frequently, and no more occasionally; and stand/walk at least 2 hours in an 8-hour day. The claimant can occasionally climb, balance, stoop, kneel, crouch and crawl, and has limited tolerance of vibrations. Finally, the claimant is limited to unskilled work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born in 1970 and was thirty-three years old, which is categorized as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of a disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from December 24, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

R. 20-29.  Following the denial by the Appeals Council of Plaintiff's request for review of the decision on October 31, 2008, Plaintiff initiated the instant civil action for judicial review of the Commissioner's final decision on January 5, 2009.

Plaintiff filed an Opening Brief on May 12, 2009, and the Commissioner filed a Response Brief on July 29, 2009.  Plaintiff filed a Reply Brief on August 19, 2009.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636 and 42 U.S.C. § 405(g).

## FACTS

### A.  Background

Plaintiff, born in 1970, was thirty-six years old on the date of the hearing and thirty-seven years old on the date of the ALJ's decision.  He has the equivalent of a high school diploma and has past relevant work as a cashier, kitchen helper, dining room attendant, assistant restaurant manager, bank teller, grocery store stock person, and maintenance supervisor.  Plaintiff is single, stands 5'8", and weighs approximately 220 pounds.  Plaintiff has not worked since December 23, 2003, and is insured for the purposes of DIB and SSI through at least December 31, 2008.

**B. Medical Evidence**

*1. Physical Medical History*

In March 1997, Plaintiff had a two-level lower back diskectomy and fusion. He complained of pain and popping sensations in his lower back post-surgery in July 1997 and complained of pain and sensations of pressure in October 1997.

In August 2004, Plaintiff underwent an orthopedic consultative examination by Dr. Nitin Khanna, an orthopedic specialist, at the request of his vocational counselor, Cathy Harris. Plaintiff complained of back pain radiating to his right leg. The report indicated findings of pain and tenderness to the right side of his spine and, based on a review of x-rays, the apparent presence of a broken rod and a loose screw on the right side. Dr. Khanna recommended a CT scan and possible surgical correction. Based on this report, Ms. Harris stated in a letter to Plaintiff that, because of the severity of his back condition, "finding suitable employment does not appear feasible." R. 173.

In March 2005, Plaintiff underwent a consultive examination by internal medicine specialist Dr. Phillip S. Budzenski. The report indicated findings of pain and tenderness but "no specific tenderness associated with his surgical repair that would be suggestive of a problem with the hardware." Plaintiff denied to Dr. Budzenski that any physician had recommended removal of a fusion screw. Dr. Budzenski found that Plaintiff exhibited a normal gait, stable stance, comfort while sitting and lying down, and no difficulty moving on or off the examining table. Plaintiff was able to walk on his toes and heels, do a tandem walk, stand on one leg, and perform a partial squat. Dr. Budzenski also found normal lateral bending but limited flexion and extension of the lower back and negative straight leg raising while sitting but producing a pulling sensation while lying down. Plaintiff had normal findings as to arms and legs with the exception of the pulling sensation noted above, full strength in all extremities, no muscle atrophy, and a normal neurological exam. Dr.

Budzenski diagnosed status post-lumbar fusion, lumbago, obesity, and hypertension under fair control; he concluded that Plaintiff should be able to perform light work with occasional to frequent medium work but precluded Plaintiff from lifting while bent more than 45 degrees.

Plaintiff saw internal medicine specialist Dr. Heine Ruiz at the East Chicago Community Health Center in May and July 2005 for treatment of back pain and hypertension. Dr. Ruiz completed a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" on September 22, 2005. Dr. Ruiz opined that Plaintiff could (a) lift up to ten pounds occasionally and up to five pounds frequently; (b) stand/walk for up to thirty minutes in an eight hour day; (c) sit for one hour out of eight; (d) never stoop, crouch, kneel, or crawl; (e) occasionally climb and balance; (f) not handle or push/pull without limitation; (g) not have unlimited exposure to vibrations; and (h) not work without multiple rest periods. The medical findings in support of each assessment are "severe back pain with radiculopathy" with the additional finding of "uncontrolled hypertension" for the sitting limitations. R. 185-87. Under "other comments," Dr. Ruiz indicated that Plaintiff needed an MRI and an evaluation by an orthopedist.

On January 26, 2006, Dr. Libiran at the East Chicago Community Health Center referred Plaintiff for physical therapy and to a pain clinic and prescribed medications for his back pain. On June 15, 2006, Plaintiff was seen for follow up on his back pain, at which time he complained of back spasms and pain while sitting straight, and Dr. Libiran diagnosed chronic back pain and hypertension. Dr. Libiran ordered a spinal x-ray with a diagnosis of back pain and spasms and prescribed Darvocet to treat Plaintiff's pain as well as Flexeril and Benicar.

On August 14, 2006, Plaintiff underwent a consultative examination by internal medicine specialist Dr. B. Sheikh. Among the findings in the five-page report, Dr. Sheikh noted that Plaintiff was stable upon standing, appeared comfortable standing and lying down, and was in no apparent

5

distress. Plaintiff had tenderness and limited range of motion in his lower back but negative straight leg raising. Plaintiff's arms and legs were normal in every respect upon testing. Dr. Sheikh also noted that Plaintiff had a normal gait, was able to walk heel to toe and tandem walk without difficulty, could squat and stoop without difficulty, could stand on one leg, and could get on and off the examination table without difficulty. Dr. Sheikh diagnosed status post-lumbar fusion pain with restricted range of motion, hypertension controlled by medication, and morbid obesity. Dr. Sheikh also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" in which he opined on Plaintiff's physical limitations, indicating that Plaintiff could (a) lift fifty pounds frequently; (b) stand/walk at least two hours in a work day; (c) sit without limitation; (d) not push or pull with his legs without limitation; (e) occasionally climb, balance, kneel, crouch, crawl, and stoop; and (f) not be exposed to vibration without limitation. No specific clinical findings in support of each limitations assessment are included on the form itself.

X-rays taken August 14, 2006, were reviewed by Dr. Alobeid, who reported,

> AP and lateral views of the lumbar spine were obtained. There are fine non-rib bearing lumbar vertebrae. There are previous laminectomies and diskectomy of L5-S1[;] transpendicular screws and fixation rods are present involving L5-S1. There is a bone graft material noted at the surgical site spanning from the lower aspect of L4 through S1 dextroscoliosis of the lower lumbar is present.

R. 209.

### 2. Mental Health History

During the March 2005 consultative examination, Plaintiff told Dr. Budzenski that he was diagnosed with depression in 1997 but had refused to take anti-depressant medication. Dr. Budzenski found no deficits in memory, intellectual functioning, or grooming.

In May and July of 2005, Dr. Ruiz diagnosed depression and prescribed medication.

During the January 2006 visit for treatment of back pain, Plaintiff also complained of depression to Dr. Libiran, who prescribed Cymbalta and Lexapro for his depression. During the June 2006 visit, Dr. Libiran diagnosed generalized anxiety disorder.

In his report from the August 2006 consultative examination, Dr. Sheikh noted that Plaintiff acted and was groomed appropriately, had grossly normal intellectual functioning, and had no memory deficits.

In August 2006, consultative psychologists Dr. Kalyani Gopal and Dr. Alan S. DeWolfe examined Plaintiff. Plaintiff reported that since his fusion surgery, he had lost his business, home, and fiancée and that he tended to get depressed due to pain. Dr. Gopal found Plaintiff to have average memory functions, the ability to learn and retain information, and no judgment or cognitive deficits. Plaintiff reported that he took care of his personal needs such as dressing, grooming, and bathing but that his mother does the cooking, cleaning, laundry, and shopping. He reported that he had no difficulty getting along with others. He said he was limited in his activities because of his pain. Dr. Gopal reported that Plaintiff cried during the examination, stated his medications made him dizzy, and had poor oral hygiene. He also indicated a diagnosis of mild to moderate major depressive disorder with a Global Assessment of Functioning ("GAF") score of 60, and he noted that Plaintiff portrayed his current status in "an exaggeratedly negative way." R. 218. Dr. Gopal also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" and found no limitations. However, he noted that, "if [Plaintiff] does have constant back pain, he may have difficulty in engaging in strenuous tasks or stand long hours."

On March 14, 2007, Plaintiff sought therapy at Tri-City Community Mental Health, on the same day as and apparently following his hearing before the ALJ. He reported that he cried a lot and isolated himself but was not a suicide risk; he also reported that he was seeking disability

benefits. On April 19, 2007, Ruth Dekker, a social worker, noted Plaintiff to have symptoms of anhedonia, agitation, appetite disturbance, excessive guilt, fatigue, diminished self-esteem, insomnia, hopelessness, hypersomnia, suicidal ideation, and weight gain. In an April 23, 2007 diagnosis and disposition based on the April 19 intake assessment, Ms. Dekker gave an admitting diagnosis of severe major depression with alcohol abuse, assigned Plaintiff a GAF of 49, referred Plaintiff for individual and group psychotherapy and a psychiatric assessment, and noted that Plaintiff was stable enough for outpatient treatment. Plaintiff met with Ms. Dekker a second time on April 26, 2007, and reported that he could not participate in group therapy because his back pain prevented him from sitting for two hours; when Ms. Dekker explained that the sessions lasted only 90 minutes, Plaintiff did not make a substantive response. Plaintiff stated that his religious beliefs prevented him from committing suicide.

### C. Plaintiff's Hearing Testimony

*1. July 2006 Hearing*

At his hearing before the ALJ on July 10, 2006, Plaintiff testified that he was thirty-six years old and had the equivalent of a high school diploma. He said that he had experience as a cashier, kitchen helper, dining room attendant, assistant restaurant manager, bank teller, grocery store stock person, and maintenance supervisor. Work assignments were frequently adjusted to allow him to avoid standing, stooping, or lifting because of his back pain. He stopped working at his last job because of absences due to back pain.

Plaintiff stated that in 2004 he learned for the first time that a fusion screw in his back was broken but said also that he heard the screw pop out the day after his 1997 fusion surgery. He testified that he could not afford medical treatment for his back and received medication from a free clinic. Plaintiff claimed that his back caused him pain rated at nine out of ten frequently, about three

weeks out of every month. He said that the fusion screw would pop out and that weeks could pass before it popped back in place. Plaintiff declared that he could not function and that he did nothing when he was in pain caused by his fusion screw popping out; he said that the pain affected his legs and arms and that medication offered no relief. He testified that this had been happening since the day after his fusion in 1997. He said he spent about three hours lying down daily and another three either sitting or standing.

Plaintiff testified that he could lift a gallon of milk, walk for about twenty feet before he had to stop, stand for about thirty minutes until he had to sit, and sit for about thirty minutes until he had to stand. He said that he could not bend, squat, kneel, raise his arms above his head, or touch his toes and only wears slip-on shoes. He stated that he does no shopping or chores. Plaintiff testified that he was "suffering depression" and that medication did not help. He said he was not aware of any problems caused by his hypertension. He stated he wants to get Medicare to get surgery to fix his back and has tried applying for jobs on the computer.

*2. March 2007 Hearing*

At his supplemental hearing before the ALJ on March 14, 2007, Plaintiff testified that his condition had worsened since July 2006 and explained that, on the previous day, he could not lay down on his back and that he could not stand more than twenty minutes at a time. He stated he could not hold his fourteen-pound nephew. He testified that his depression was worse and that he felt pretty bad all the time, cried a lot, and stayed in his room. The ALJ noted Plaintiff to be crying during the March hearing. Plaintiff stated his belief that during his examination, Dr. Budzenski caused him to bend in such a way that the screw popped out and caused his back pain to worsen. He avoids most bending and lifting of even a gallon of milk.

### D. Testimony of Plaintiff's Sister

Plaintiff's sister testified in March 2007 that she saw Plaintiff about once or twice a month and that she frequently saw him crying and heard him complain about his pain. She said that he did not do any chores and that she felt he had moderate to extreme depression not helped by medication.

### E. Testimony of Medical Expert

Dr. Ashok Jilhewar appeared and testified as the Medical Expert at the July 2006 hearing and opined that Plaintiff did not meet or equal Listing 1.04A due to lack of objective evidence of significant motor weakness. He testified that Plaintiff's obesity was an impairment but did not constitute morbid obesity and that Plaintiff received treatment for high blood pressure. He felt that Dr. Budzenski's findings and Dr. Ruiz's opinion were similar but noted that Dr. Ruiz provided no clinical support for his conclusions. Dr. Jilhewar completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" on which he concluded that Plaintiff could occasionally lift ten pounds; frequently lift eight pounds; stand/walk at least two hours out of eight; never crawl, crouch, kneel, or climb ladders, ropes, or scaffolds; occasionally balance, stoop, and climb stairs; frequently climb ramps; and not be exposed to hazards without limitation. Dr. Jilhewar explained that Plaintiff cannot operate moving machinery in a standing position because injury may occur if he loses his balance. He recommended additional diagnostic imaging and another consultative examination with a focus on motor weakness.

Dr. Jilhewar testified that a fusion screw can come loose or break and it is "not clinically incomprehensible" that it could pop in and out after it broke although it could not engage as when originally placed in the bone. R. 295. He also stated that Plaintiff was on medication designed to address moderate pain and that Plaintiff reports sleeping okay. He opined that fusion hardware failure could cause severe pain but stated he could not make any direct correlation between the state

of Plaintiff's fusion hardware and his symptoms. Dr. Jilhewar indicated that he is skeptical of a patient who complains of severe pain but sleeps well and does not go to the ER even without insurance. Dr. Jilhewar testified that pain is unique but that he has not seen a loose screw causing pain for three weeks. He testified that 8/10 pain would severely limit physical activity and that even a level of 4/10 would make it difficult for one to concentrate.

### F. Testimony of Vocational Expert

*1. July 2006 Hearing*

Thomas Grzesik testified as the Vocational Expert ("VE") at the hearing and also submitted a pre-hearing statement describing Plaintiff's past work. The VE testified at the hearing that Plaintiff's past work included work as a cashier (light, unskilled), dining room attendant (light, unskilled), assistant restaurant manager (light, low semi-skilled), bank teller (light, low semi-skilled), grocery store stock clerk (heavy, low semi-skilled), and maintenance supervisor (light, low semi-skilled). The ALJ then posed four hypotheticals.

The ALJ's first hypothetical was an individual with Plaintiff's age, education, and work experience and the ability to perform work as described in the July 10, 2006 Medical Source Statement from Dr. Jilhewar, to which the VE responded that such an individual could not perform any of Plaintiff's past work but could perform work at the sedentary, unskilled level and identified three jobs at that level. The VE identified sedentary hand packager work (4,000 jobs), stating that, although it is classified as medium level work in the Dictionary of Occupational Titles ("DOT"), work exists at all exertional levels. He also identified electronic assembly (3,500 jobs) and mechanical assembly (4,000 jobs) work at the sedentary level.

The second hypothetical relied on the limitations found in Dr. Ruiz's 2005 Medical Source Statement, to which the VE stated that all work would be eliminated because it constitutes less than an eight-hour workday.

The third hypothetical credited Plaintiff's testimony except for the lying down and pain; indicated walking only 20 feet; standing and stretching every 10 minutes, during which he cannot do anything else; standing for 30 minutes, then sitting for 20 minutes; occasional lifting of one gallon of milk but no frequent lifting; no climbing of ladders, kneeling, squatting, or bending to touch his toes; climbing of only six or seven stairs; an ability to reach above his head; and use of a grasper to pick up items from the floor. To this hypothetical, the VE testified that all work would be precluded because of the total inactivity in a standing position. Removing the inability to be active when standing, the VE testified that an individual could perform the sedentary jobs previously described with the sit/stand option and with the same numbers of jobs.

In the fourth hypothetical, the ALJ added a need to lie down for three hours a day, which eliminated all work according to the VE.

The ALJ then asked whether the VE's testimony was consistent with the DOT and the companion publication of the Selected Characteristics of Occupations ("SCO"), to which the VE testified that his testimony is consistent with the DOT except for the hand packager work as described for the first hypothetical.

Upon cross-examination, counsel asked how the materials would be brought to Plaintiff at the jobs identified in response to the first hypothetical, to which the VE indicated it would be by conveyor belt or roller. The VE then indicated that a sedentary worker "has a workplace in front of them where there would be a space between them and the actual conveyer." R. 313.

### 2. *March 2007 Hearing*

At the supplemental hearing, the VE appeared again, and the ALJ posed a fifth hypothetical including limitations noted in the physical consultative evaluation by Dr. Sheikh and the psychological consultative evaluation by Dr. Gopal that occurred in the interim. The VE indicated that, because the physical RFC from Dr. Sheikh limits Plaintiff to seated work, even though he can lift at a medium level, he is limited to a sedentary position. Thus, for the fifth hypothetical, the VE opined that the individual could not perform Plaintiff's past work but could perform sedentary, unskilled work, listing the same three jobs he had identified at the previous hearing.

The ALJ then gave a sixth hypothetical based on Dr. Jilhewar's Medical Source Statement together with Dr. Gopal's consultative evaluation, and the VE stated that the individual would be able to perform the same jobs as mentioned in the first hypothetical. The seventh hypothetical included Dr. Ruiz's Medical Source Statement and the mental RFC from Dr. Gopal's consultative evaluation, to which the VE responded that the individual could not perform any work.

Again, when the ALJ inquired whether the VE's testimony was consistent with the DOT and the companion publication of the SCO, the VE responded in the affirmative. *Id.* Counsel then asked for the DOT numbers of the identified jobs; the VE did not have them available but confirmed that they are the standard numbers for those jobs.

Counsel asked whether an individual with the limitations testified to by Plaintiff could perform work, and the VE responded that there would be no work because of his postural limitations due to severe pain.

The ALJ then asked whether a GAF of 60, which the VE stated would constitute moderate limitations, would affect his answers to hypotheticals five and six, to which the VE answered that it would not.

# G. The ALJ's Decision

On June 25, 2007, the ALJ found Plaintiff not disabled, finding work to exist at step five of the sequential analysis. The ALJ found Plaintiff to have severe impairments of disorders of the back, hypertension, and obesity but found that Plaintiff did not have an impairment that met or medically equaled an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ determined that Plaintiff's mental impairments were non-severe, finding they only caused mild limitations at most. The ALJ found Plaintiff's description of his symptoms to be somewhat credible based on his medically determinable impairments but found his statements concerning the intensity, persistence, and limiting effects of the symptoms not entirely credible.

The ALJ found Plaintiff to have the residual functional capacity to lift 50 pounds "frequently, and no more than occasionally;" to stand/walk two hours in an eight-hour day; and to occasionally climb, balance, stoop, kneel, crouch, and crawl with limited tolerance for vibrations. The ALJ further limited him to unskilled work. In making this determination, the ALJ noted Plaintiff's allegations of severe back and right leg pain to be inconsistent with the "relatively unremarkable" findings of Plaintiff's several physical examinations. R. 25. The ALJ then adopted Dr. Sheikh's "Medical Assessment of Ability to Do Work-Related Activities (Physical)" as his finding of physical residual functional capacity. He found this assessment to be the most informed and consistent with the testimony and medical evidence as a whole. The ALJ also incorporated Dr. Gopal's "Medical Assessment of Ability to Do Work-Related Activities (Mental)" and his assignment of a GAF of 60 as a basis for restricting Plaintiff to unskilled work.

Finding that Plaintiff was unable to perform any past relevant work, the ALJ determined that, based on the VE's testimony, Plaintiff can perform work as an electrical assembler, mechanical

assembler, and hand packager and that a sufficient number of such jobs existed in the national economy.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to Step 2; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to Step 3; (3) Does the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to Step 4; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to Step 5; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant evidence of record. *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id*. at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff argues that the ALJ's decision was erroneous and not supported by substantial evidence for the following reasons: (1) the ALJ failed to properly weigh the opinions of the treating

physicians and the consultative examiners; (2) the ALJ failed to properly incorporate all of Plaintiff's impairments and their combined effect into the RFC finding; (3) the ALJ made an improper credibility determination; and (4) the ALJ erroneously found Plaintiff capable of work at step five. The Court addresses each argument in turn, finding that the ALJ did not make any errors of law and that his decision is supported by substantial evidence of record.

## A. Weight of Treating Source Opinion

Plaintiff contends that, in adopting the findings of consultative examiners Dr. Sheikh and Dr. Gopal in his determination of Plaintiff's RFC, the ALJ dismissed other evidence of record without sufficient explanation. Plaintiff asserts that the ALJ did not assign the proper weight to Plaintiff's own treating physical and mental health providers or give good reasons for rejecting their opinions. He argues that the RFC, based on the Medical Source Statement of consultative physician Dr. Sheikh, was not supported by evidence in the record and was adopted despite inconsistencies with other evidence of record. Finally, Plaintiff claims that it was improper for the ALJ to adopt the Medical Source Statement of Dr. Gopal, the consultative psychologist, in light of all the evidence regarding mental impairment.

Plaintiff disputes the ALJ's reliance on the consultative examinations of Dr. Sheikh and Dr. Gopal, which were obtained between the two hearings. An ALJ must give the medical opinion of a treating doctor controlling weight as long as the

> treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. § 404.1527(d)(2); *see also* 20 C.F.R. § 416.927(d)(2); *Nicholson v. Astrue*, No. 08-4016, 2009 WL 2512417, at *3 (7th Cir. Aug. 18, 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p; SSR 96-2p.

The referenced factors listed in paragraphs (d)(2)(i) through (d)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case. 20 C.F.R. §§ 404.1527(d), 416.927(d). Acceptable medical sources for the purpose of assisting an ALJ in determining whether a claimant has a medically determinable impairment include licensed physicians and licensed or certified psychologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). The ALJ may rely on evidence from other sources, including social workers, to show the severity of a claimant's impairments and how it affects the ability to work. *Id.* at §§ 404.1513(d)(3), 416.913(d)(3).

An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ is able to "minimally articulate his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Clifford*, 227 F.3d at 871 and quoting *Clifford*, 227 F.3d at 870). In fact, "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight. At that point, the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." *Bauer*, 532 F.3d at 608 (internal citations and quotation marks omitted) (citing *Hofslien*, 439 F.3d at 376-77). If the ALJ makes a reasoned choice between disparate medical findings, it is beyond the capacity of the Court to review because of the deference afforded the ALJ's decisions. *Gaylor v. Astrue*, 292 F. App'x 506, 512 (7th Cir. 2008). It is the

ALJ's responsibility to weigh conflicting evidence and make a determination on disability, and the ALJ has a responsibility to confront the evidence in Plaintiff's favor and explain why it is not persuasive. *Id.* at 512, 513.

In this case, the clinical evidence of record includes conflicting assessments about the nature and severity of Plaintiff's pain and his ability to lift and bend. Within that context and leading to his ultimate decision to rely on the opinion of Dr. Sheikh, the ALJ noted and weighed the opinions of each consultative and treating physician, noting the extent of the doctor's physical examination of Plaintiff and the bases for the doctor's opinion. For Drs. Khanna, Budzenski, and Sheikh, the ALJ acknowledged their detailed clinical findings based on having put Plaintiff through a series of flexing and motor exercises for which each recorded the quantitative results. For example, Dr. Khanna noted Plaintiff's report of 10/10 back pain and limited forward flexion of 40 degrees but also the ability of Plaintiff to heel and toe walk; hip, knee, and ankle range of motion testing that was full, non-tender, and stable; intact sensation through the lower extremities; and that the motor examination from the L3-S1 distribution was near normal at 5-/5. For Dr. Budzenski, the ALJ recognized his notation that Plaintiff reported back pain but that he found 5/5 motor strength in all extremities, supine leg raise to 30 degrees and seated leg raise to 90 degrees, and normal walking and squatting abilities and that Plaintiff seemed comfortable in the seated and supine positions. Similarly, the ALJ noted that Plaintiff reported low back pain to Dr. Sheikh, who examined Plaintiff after the first hearing, but that Dr. Sheikh found Plaintiff to have a stable station and to appear to be comfortable in the seated and supine positions. The ALJ detailed Dr. Sheikh's findings that Plaintiff had a normal gait, could heel to toe and tandem walk without difficulty, could stoop and squat without difficulty, and got on and off the examination table unaided and without difficulty. Dr.

Sheikh found 5/5 motor strength, normal sensation, normal cranial nerves, intact reflexes, and forward bending to 70 degrees.

In contrast with the extensive clinical findings documented by the consultative examiners, the ALJ noted the minimal documented findings by treating physicians Dr. Ruiz and Dr. Libiran. The ALJ noted that their reports reflect consistent complaints of low back pain with subjective allegations of spasm. However, he accurately noted that Dr. Ruiz did not document any clinical findings in his two examinations of Plaintiff. The ALJ acknowledged that, on the two occasions that Plaintiff saw Dr. Libiran in January and June 2006, Plaintiff had a positive straight leg test, but expressed concern that at "what point, and from what position, he tested positive is not shown." R. 25. He also questioned Dr. Libiran's January 2006 visit report, which checked the musculoskeletal box as "normal" despite the written notation of a positive straight leg test.

After summarizing the reports of each doctor, the ALJ articulated the inconsistencies in the record. He found that with the exception of limited range of motion in the lumbar spine and positive straight leg raise on a few occasions, Plaintiff's physical examinations were relatively unremarkable. He found the "major inconsistency" to be the findings of a stable station, normal gait, and ability to heel/toe and tandem walk notwithstanding the allegations of severe back and right leg pain. He also noted that, contrary to Plaintiff's testimony, he was able to stoop and squat during the most recent examination by Dr. Sheikh. Finally, the ALJ noted that no other clinical findings supported these opinions, as Plaintiff never presented for additional imaging or physical therapy treatment that was prescribed.

In a similar fashion, the ALJ reviewed each of the physical capacity assessments and/or opinions of consultative examiners Dr. Khanna, Dr. Budzenski, Dr. Ruiz, Dr. Jilhewar, and Dr. Sheikh as well as that of Ms. Harris, the vocational rehabilitation counselor with whom Plaintiff met.

After reviewing in detail the assessment made by each, the ALJ articulated his basis for the weight given to each. For Ms. Harris, he noted that her vocational opinion was not entitled to any special weight. The ALJ reasoned that Dr. Khanna's 2004 opinion was based on what Plaintiff had told her during the course of the evaluation and that Dr. Khanna was not intending to convey a medical opinion of disability. The ALJ found Dr. Budzenski's assessment incomplete because he did not quantify what he meant by "light" and/or "medium" work. Plaintiff argues that this basis for rejecting Dr. Budzenksi's limitation to light work with no lifting bent over greater than 45 degrees is in error. However, because Dr. Budzenski's opinion was less restrictive than the ALJ's ultimate RFC finding, it is unclear why Plaintiff disputes the decreased weight given by the ALJ to the opinion. Regardless, the ALJ is correct that Dr. Budzenski does not define the limits of the terms "light" and "medium" in his report.

For Dr. Ruiz, the ALJ acknowledged that he was a treating physician but discounted his opinion because he completed his assessment in September 2005 after seeing Plaintiff only two times, because he did not provide any clinical or laboratory findings in support of his restrictions, and because some of the limitations he described (the inability to sit, stand and/or walk in any combination more than 90 minutes during an 8-hour day) are contrary to what the claimant himself alleges he can do. Thus, Plaintiff incorrectly argues that the ALJ rejected the most restrictive limitations imposed by Dr. Ruiz simply because he only saw Plaintiff on two occasions. Plaintiff also argues that the ALJ erred by failing to give Dr. Ruiz any weight, as reflected by the RFC. However, because the ALJ identified well-supported contradicting evidence in the form of the opinions of other examining physicians and ultimately Dr. Sheikh, Dr. Ruiz's opinion became just one more piece of evidence in the overall balance of the ALJ's analysis. *See Bauer*, 532 F.3d at 608.

For Dr. Jilhewar, the medical expert, the ALJ found that the lifting/carrying restrictions he imposed were inconsistent with Plaintiff's normal upper extremity findings, and the ALJ noted that the consultative examination by Dr. Sheikh subsequent to Dr. Jilhewar's opinion showed the ability to squat without difficulty in contrast to Dr. Jilhewar's findings. In fact, the results of Dr. Sheikh's examination were the very information that Dr. Jilhewar recommended the ALJ obtain. Plaintiff's only contention with the ALJ's treatment of Dr. Jilhewar's opinion was that the ALJ did not incorporate Dr. Jilhewar's limitation of Plaintiff to no work around moving machinery, which the VE testified would eliminate all work. However, Dr. Jilhewar explained that Plaintiff cannot operate moving machinery in a *standing* position because injury may occur if he loses his balance; the VE testified that, in a seated position for sedentary work, a work station would separate Plaintiff from the moving conveyor belt.

Finally, the ALJ found Dr. Sheikh's assessment to be the most informed and consistent with the medical evidence as a whole because it restricts standing/walking to occasional, which takes into account Plaintiff's chronic back pain, but it allows for expanded lifting and carrying based on Dr. Sheikh's examination. The ALJ agreed that Dr. Sheikh's addition of occasional postural activities was consistent with the clinical findings. Although Dr. Sheikh's Medical Source Statement form itself does not contain the basis for each of his findings, his concurrent examination report is thorough. In contrast, Dr. Ruiz's Medical Source Statement contains no findings, there is no concurrent examination report, and the treatment notes from the two visits from Plaintiff in May and June 2005 are minimal. Notably, Dr. Sheikh's opinion is largely consistent with that of the medical expert, Dr. Jilhewar, with the exception of the lifting restrictions, which the ALJ nevertheless effectively reduced because of the restrictions of sedentary work.

Plaintiff contends that the ALJ may have erred when determining whether Plaintiff equaled a Listing because Dr. Sheikh allegedly did not test for some areas, including motor strength, that Dr. Jilhewar suggested. However, Dr. Jilhewar recommended only muscle testing and x-rays; Dr. Sheikh documented his clinical findings of full strength in all muscle groups, and x-rays showing no abnormality were taken the day of Dr. Sheikh's examination of Plaintiff. In his decision, the ALJ noted that Dr. Jilhewar, a Board-certified internist, stated there is no evidence of significant motor weakness or loss under listing 1.04A. He noted, in particular 5-/5 motor strength during the orthopaedic examination in August 2004 and 5/5 motor strength in March 2005. The Court finds that the ALJ did not err in his step three listing determination.

Therefore, the Court finds that the ALJ did not err in giving controlling weight to Dr. Sheikh's opinion and the conclusions in his Medical Source Statement. The ALJ sufficiently articulated the basis for the weight given to each physician, including the presence or absence of clinical or laboratory findings, the consistency with other evidence of record and Plaintiff's own testimony, and the length of the treating relationship.

Regarding his mental health, Plaintiff also contests the ALJ's reliance on Dr. Gopal's consultative examination, arguing that Dr. Gopal did not have the benefit of Plaintiff's subsequent mental treatment notes, which Plaintiff suggests demonstrate a severe mental impairment. In determining that Plaintiff does not have a severe mental impairment at step two of the sequential analysis, the ALJ noted that Plaintiff attributed his depression to his physical condition. The ALJ recognized that, although Lexapro had been prescribed by his treating physician in 2006, Plaintiff did not list any antidepressants among his current medications. The ALJ noted the absence of any counseling or other forms of psychiatric or psychological treatment and arranged for the post-hearing evaluation by Dr. Gopal and Dr. DeWolfe. The ALJ then reviewed in detail the findings

from that evaluation and summarized the substantial formal testing Plaintiff underwent at that time. He noted that Dr. Gopal's formal finding was major depressive disorder (mild to moderate) with a GAF of 60. He then agreed with the conclusion of Dr. Gopal's Medical Source Statement and, employing the special technique for assessing mental limitations pursuant to 20 C.F.R. § 404.1520a, found that Plaintiff had only mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace as a result of the diagnosis of depression and that Plaintiff has never experienced an episode of decompensation.

Plaintiff argues that the ALJ's reliance on the CE's evaluation is arbitrary given Plaintiff's subsequent records from Tri-City Community Mental Health Center in April 2007, when he was diagnosed with recurrent, severe depression with alcohol abuse and a GAF of 45. The Court finds that the ALJ sufficiently articulated his basis for crediting Dr. Gopal's findings in her Medical Source Statement over those of Ms. Dekker, a social worker, in her reports. The ALJ recognized that Plaintiff presented at Tri-City but reasoned that his "litany" of reported symptoms were inconsistent with his indicators from the MMPI, administered by Dr. Gopal. The ALJ noted that Ms. Dekker's assessment was provisional only and that Plaintiff had not completed the recommended psychiatric evaluation. The ALJ also found that Plaintiff's claim that he could not attend therapy for a two-hour session because of limitations due to his pain was less than credible given that Ms. Dekker then explained that the sessions lasted only an hour and a half without comment from Plaintiff. Although Plaintiff cites case law to suggest that Plaintiff's failure to seek mental health treatment may be the result of mental illness, there is no evidence of record to support this supposition. The Court finds that the ALJ sufficiently articulated his rationale for relying on the well-supported and documented report of Dr. Gopal over that of Ms. Dekker, including her assignment of a GAF of 45, and his finding that Plaintiff did not have a "severe" impairment at step

two. Moreover, as discussed below, the ALJ nevertheless took into account Plaintiff's depression by limiting him to unskilled work in the RFC.

### B. Combined Effect of Severe and Non-Severe Impairments on Disability and Side Effects of Medication

Plaintiff argues that the ALJ failed to consider the combined effect of Plaintiff's pain on his mental abilities and of his obesity on his pain. Plaintiff also contends that the ALJ did not account for the dizziness that resulted as a side-effect of his medications. In evaluating evidence of disability, the ALJ must consider "the aggregate effect of [the] entire constellation of ailments–including those impairments that in isolation are not severe." *Hisle v. Astrue*, 258 F. App'x 33, 36 (7th Cir. 2007) (alterations in original) (quoting *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (citing 20 C.F.R. § 404.1523); *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006); *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005)). This includes psychiatric problems that may exacerbate a claimant's underlying physical impairments. *See id*. at 36 (citing *Gentle*, 430 F.3d at 868-69). Social Security Ruling 96-7p emphasizes that, when a combination of symptoms may be the basis for a finding of disability, "the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p. The ALJ must consider the side effects of any medication the individual takes to alleviate pain or other symptoms. *Id.*

First, with no analysis, Plaintiff comments in his discussion of the ALJ's treatment of his mental impairment that "the ALJ fails to account for the effects of Plaintiff's pain on his ability to pay attention and concentrate, as even noted by the ME." Pl. Br., p. 19. However, despite finding that Plaintiff did not have severe depression, the ALJ nevertheless limited Plaintiff to unskilled work as a result of the depression. Although Plaintiff criticizes the ALJ for "only" limiting him to this

work, Plaintiff offers no other limitations that the ALJ should have considered nor explains why the limitation to unskilled work does not fully address Plaintiff's mental limitations.

Second, Plaintiff argues that, although the ALJ cites obesity as a severe impairment, he failed to abide by Social Security Ruling 02-1p and to incorporate any additional limitation based on obesity, suggesting that Plaintiff's "obesity can further account for the severity of his pain, which the ALJ rejects." Pl. Br., p. 20. An ALJ must consider any limiting effects of obesity on a claimant's overall condition. *Hisle*, 258 F. App'x at 37 (citing *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000)). Obesity is considered a "severe" impairment, as the ALJ found in this case, "when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." SSR 02-1p at *4. At step three, the Court should consider that "[o]besity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing," and "this is especially true of musculoskeletal, respiratory, and cardiovascular impairments." *Id.* at *5. However, the severity or functional effects of obesity combined with other impairments may not be assumed. *Id.* at *6. Each case will be evaluated based on the information in the record. *Id.* The ALJ must consider the extent to which symptoms limit the individual's ability to do basic work activities at each step of the sequential analysis. *See* SSR 96-7p.

Plaintiff relies on *Young v. Barnhart*, 282 F. Supp. 2d 890, 896 n. 3 (N.D. Ill. 2003), for the proposition that the ALJ should have incorporated Plaintiff's obesity as a limitation in the RFC. In *Young*, the ALJ failed to consider Plaintiff's obesity, in particular in developing the record during the hearing when he questioned the medical expert about shortness of breath and did not inquire whether obesity factored into the analysis. *Young*, 282 F. Supp. 2d at 893, 896. The district court

found that such incompleteness on the question of how obesity impacted the Plaintiff's other impairments required remand. More recently, the Seventh Circuit has required that the claimant articulate how obesity limits function and exacerbates impairments and has found that the failure of an ALJ to expressly address obesity following review of medical opinions is harmless error if the ALJ has implicitly considered the obesity through review and discussion of the doctor reports. *See Prochaska*, 454 F.3d at 736-37; *Skarbek*, 390 F.3d at 504 (finding that the ALJ's adoption of limitations suggested by doctors who were aware of claimant's obesity in combination with the claimant's failure to "specify how his obesity further impaired the ability to work" was harmless error).

In this case, the ALJ found Plaintiff to have severe impairments of back pain, obesity, and hypertension but found that none of them individually or in combination meets or medically equals a listed impairment, analyzing the Listings and noting that Plaintiff's obesity is neither morbid, symptomatic, or limiting. In addition, the ALJ considered "all of the opinions of record from medical consultants designated by the Commissioner" wherein Plaintiff's pain and obesity are discussed or reported and those opinions were adopted into his RFC determination. R. 22. The ALJ also referred to Plaintiff's testimony about his weight from both the July 2006 and March 2007 hearings, as well as to evidence from Plaintiff's medical examinations documenting obesity. Moreover, the record does not contain any testimony or evidence of how Plaintiff's obesity–as opposed to his pain–affected his mobility and range of motion, aggravated his back pain or depression, or limited his function, and Plaintiff has not cited any in support of his arguments. Therefore, any failure of the ALJ to specifically address the effect of obesity on Plaintiff's pain in the RFC or in the questioning to the ME is harmless.

Finally, Plaintiff contends that the side-effect of dizziness from his medication is missing from the RFC and should have prompted a limitation of no work around moving machinery based on Dr. Jilhewar's testimony. At the first hearing, Dr. Jilhewar explained that his proposed limitation related to moving machinery was to limit Plaintiff from standing to operate moving machinery because he might sustain an injury if he lost his balance. Later at the hearing, this limitation on moving machinery was discussed with the VE, who clarified that the limitation was applicable to standing positions and that a person performing a sedentary job would have a work station between himself and the moving roller or conveyor belt. As the ALJ found Plaintiff limited to sedentary work, this limitation was not implicated and no error was committed by the ALJ.

## C. The ALJ's Credibility Finding

Plaintiff asserts that the ALJ failed to consider SSR 96-7p and 20 C.F.R. § 404.1529 and argues that the Court should give less deference to the ALJ's credibility determination because he relied on objective evidence rather than subjective considerations, identifying several specific alleged failings.

An ALJ is in the best position to observe witnesses and to make an appropriate evaluation as to their credibility. *Skarbek*, 390 F.3d at 504. Thus, a reviewing court will not reverse an ALJ's credibility determination unless it is "patently wrong." *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007) (quoting *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence. *See* SSR 96-7p.

When there is objective medical evidence that could reasonably be expected to produce pain, an ALJ must consider a claimant's subjective complaint in light of such evidence. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008); *see also* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). An ALJ is not required to give full credit to every statement of pain made by the claimant or to find that a disability exists each time a claimant states that he or she is unable to work, and a lack of objective evidence is one factor to be considered by the ALJ. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996) (quoting *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993)) (internal quotations omitted); s*ee also* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); SSR 96-7p at *6 (providing that a claimant's statements regarding the intensity or persistence of her symptoms "may not be disregarded solely because they are not substantiated by objective medical evidence"); *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (discussing through secondary sources the complexity of pain and the difficulty of understanding its etiology in the context of an ALJ evaluating claimant testimony based on "objective" evidence); *Schmidt*, 395 F.3d at 746-47 (recognizing that an ALJ cannot disbelieve a claimant's testimony solely because it conflicts with the objective medical evidence). However, despite the inherent difficulty of evaluating such testimony, an administrative law judge will often have solid grounds for disbelieving a claimant who testifies that he has continuous, agonizing pain. *See Johnson*, 449 F.3d at 806. For example, discrepancies between the "degree of pain" reported by a claimant and that suggested by medical evidence "is probative of exaggeration." *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (citing *Powers v. Apfel*, 207 F.3d 431, 435-36 (7th Cir. 2000)); *see also Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (recognizing that "discrepancies between objective evidence and self-reports may suggest symptom exaggeration").

Factors to be considered by an ALJ evaluating a claimant's complaint of pain or symptoms in addition to objective medical evidence include:

(i)      The claimant's daily activities;

(ii)     The location, duration, frequency, and intensity of the claimant's pain or other symptoms;

(iii)    Factors that precipitate and aggravate the symptoms;

(iv)     The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

(v)      Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

(vi)     Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(vii)    Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p at *3.

Contrary to Plaintiff's argument, the ALJ in this case did not reject Plaintiff's credibility solely on the basis of the objective evidence; rather, the ALJ adequately explained his determination that Plaintiff's statements as to the intensity, persistence, and limiting effects of his pain were not fully credible based on multiple considerations. After accurately summarizing Plaintiff's testimony, the ALJ noted that the plausibility of Plaintiff's testimony as to a screw in his back popping in and out was contradicted by Dr. Jilhewar, who testified that once a screw was broken or loose, it could not be repositioned as when originally installed but that it would not be impossible for it to pop in and out. He referenced Dr. Jilhewar's testimony questioning why Plaintiff never sought emergency room care for his breakthrough pain for so many years, and he, himself, questioned why Plaintiff waited over eight years to seek treatment through a clinic, if, as he claims, the screw broke shortly after the surgery in 1997 and he has been experiencing periodic but debilitating symptomatology ever since. The ALJ noted that Plaintiff had not obtained recommended therapy or diagnostic testing and that he had not participated in group therapy sessions. This is an instance in which the discrepency between the degree of pain alleged and that suggested by the medical evidence supports the ALJ's determination. Although Plaintiff testified that he did not have the financial resources to

seek treatment, he was engaged in substantial gainful activity through 2003. The ALJ was entitled to consider Plaintiff's failure to seek treatment and to take into account his explanations in his testimony for the lack of treatment. *See Sienkiewicz*, 409 F.3d at 803-04.

Second, the ALJ found the clinical evidence inconsistent, referencing Plaintiff's claims of 10/10 pain as inconsistent with multiple clinical examinations that found him able to walk normally and bend to some degree and Plaintiff's contradictory statements about how well he sleeps. The ALJ described Plaintiff's physical examinations as "relatively unremarkable" and commented that the "major inconsistencey arises from findings of a stable station, normal gait and ability to heel, toe, and tandem walk, despite allegations of severe back and right leg pain." R. 25. The ALJ noted that, contrary to Plaintiff's testimony, Dr. Sheikh found Plaintiff able to stoop and squat and that Plaintiff's neurological signs have been largely if not entirely intact. In this vein, the ALJ commented that the two abnormalities that arose in range of motion limitations and positive straight leg raise are subjective and can be influenced by effort, cooperation, and/or motivation. With the exception of Dr. Ruiz, who opined that Plaintiff was more limited than even Plaintiff alleged, the other doctors of record opined that Plaintiff was less limited than he claimed.

Finally, the ALJ remarked that, notwithstanding his reported back problems, Plaintiff nevertheless returned to work after his surgery and engaged in substantial gainful activity from 1999 through 2002 and worked in some short-term jobs in 2003, which required light to medium levels of exertion. To the extent Plaintiff again argues the effects of medication and the complication of obesity in this conext, the Court has already found that the ALJ properly considered all of Plaintiff's impairments. Unlike in *Ramey v. Astrue*, F. App'x 426, 429 (7th Cir. 2009), and *Gaylor*, 292 F. App'x 506, the Plaintiff in this case does not have corroborating evidence of repeated diagnoses of severe pain and invasive or burdensome treatment that was ultimately unsuccessful. Notably, the

ALJ did not entirely discredit Plaintiff's subjective testimony that he spends substantial amounts of time sitting and lying down because of pain, concluding that Plaintiff's medically determinable impairments could reasonably be expected to produce some of his symptoms. Therefore, the Court finds that the ALJ confronted the evidence and explained why Plaintiff's testimony is not wholly persuasive, analyzing the consistency of Plaintiff's statements with other information in the case record, the medical evidence, medical treatment history, other sources of information, and observations of the individual. It was not patently wrong for the ALJ to conclude that, although Plaintiff suffered some pain due to his severe back impairment, Plaintiff exaggerated the impact of the pain on his ability to work.

## D. The ALJ's Hypotheticals and Step Five Finding

As his final argument, Plaintiff attacks the ALJ's step five determination. First, Plaintiff argues that the ALJ's hypothetical questions to the VE were flawed because they did not contain all of Plaintiff's impairments supported by the record, including the ME's limitation as to no work around moving machinery. However, an ALJ's hypothetical question should only include those limitations that the ALJ finds credible. *See Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (quoting *Schmidt*, 496 F.3d at 846); *Jens*, 347 F.3d at 213. Additionally, a hypothetical does not need to include every detail of the claimant's impairments if the record shows that the VE knew the extent of the claimant's limitations. *See Young*, 362 F.3d at 1003; *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994). As discussed above, because the ALJ did not err in his credibility determination or his formulation of Plaintiff's RFC, the hypothetical, which set forth sedentary and unskilled labor limitations consistent with the RFC, was proper. Plaintiff also again argues that the ALJ failed to incorporate the limitation from Dr. Jilhewar of no work around moving machinery. As explained in Part C, Dr. Jilhewar's limitation was based on standing positions, and the ALJ limited Plaintiff

to sedentary work. Moreover, the VE's testimony indicated that sedentary work was not limited based on moving machinery because the work itself would not directly involve moving machinery and a work space would separate Plaintiff from the moving conveyor belt.

At step five, Plaintiff also argues that the ALJ relied on the VE's testimony without complying with Social Security Ruling 00-4p. The Ruling requires that an ALJ who receives testimony regarding the requirements of a particular job inquire of the VE about any possible conflict between the testimony and the DOT. *See* SSR 00-4p; *Prochaska*, 454 F.3d at 735. To the extent that there is a conflict, SSR 00-4p requires the ALJ to obtain an explanation if the conflict between the testimony and the DOT is "apparent." *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (citing *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). When, as in this case, Plaintiff failed to identify any conflict at the hearing, Plaintiff must demonstrate that the conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance." *Overman*, 546 F.3d at 463. Plaintiff has not met this burden.

At the hearing, the VE testified that, based on the hypothetical, the jobs of electrical assembler, mechanical assembler, and hand packager existed in the regional economy. The VE further clarified that, although the hand packager position is classified in the DOT as medium level work, he had knowledge that the position exists at all exertional levels in the region, with approximately 4,000 jobs in the area, which is a significant number and alone supports the ALJ's step five finding. However, Plaintiff now argues that there are inconsistencies between his limitations and the DOT descriptions of the other two positions of electrical assembler and mechanical assembler. At both hearings, in compliance with SSR 00-4p, the ALJ explicitly asked the VE if his testimony was consistent with the DOT and the SCO to which the VE responded in the affirmative. Although Plaintiff's attorney asked the VE about the numbers in the DOT for each job

at the second hearing and the VE replied that they were the "standard" numbers, Plaintiff's attorney made no further inquiry and Plaintiff has not made any showing that the alleged conflict was "apparent" at the hearing. Because the VE identified and explained the inconsistency with the hand packager job, it is reasonable to expect that this same VE would have articulated any inconsistencies between the DOT and the other two job categories. Accordingly, any error the ALJ may have made at step five was harmless.

## CONCLUSION

For the foregoing reasons, the Court finds that the decision of the ALJ is supported by substantial evidence and does not contain any errors of law. Therefore, the Court **DENIES** the Social Security Opening Brief of Plaintiff and **REAFFIRMS** the ALJ's decision in all respects.

SO ORDERED this 19th day of November, 2009.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc: All counsel of record